THE HIGH COURT OF AMERICAN SAMOA

TRIAL DIVISION

AMERICAN SAMOA GOVERNMENT     )     HCCR No. 10-03
                              )
     Plaintiff,              )
                              )
vs.                           )
                              )
RICHARD MAJHOR,               )
                              )
     Defendant.              )
_____)

Before the Honorable LYLE L. RICHMOND, Associate Justice
presiding; Associate Judges SAGAPOLUTELE MALAEOLA A.A. and
TAPOPO M. VAIFANUA:

REPORTER'S TRANSCRIPT OF PROCEEDINGS
HELD ON
APRIL 6, 2005

COPY

Reported and Prepared by:  ELIZABETH PUNI/Court Reporter

EXHIBIT 5

- 1 -

**APPEARANCES:**

**For the Government:**          OFFICE OF LEGAL AFFAIRS
                                 **BY:   MS. JULIE SIONE, ESQ.**
                                 **Assistant Attorney General**
                                 Executive Office Building
                                 Pago Pago, American Samoa 96799
                                 (684) 633-4163


For the Defendant:               OFFICE OF THE PUBLIC DEFENDER
                                 **BY:   MR. ANDREW STAVE, ESQ.**
                                 **Assistant Public Defender**
                                 Executive Office Building
                                 Pago Pago, American Samoa 96799
                                 (684) 633-1286; and

                                 **MR. ERIC A. SEITZ, ESQ.**
                                 **Attorney-at-Law**
                                 820 Mililani Street, Suite 214
                                 Honolulu, HI
                                 (808) 533-7434



                                 *  *  *  *


Court Clerk:                     TEMUKISA MALAE

Court Interpreter:               FALEUPOLU

1    PAGO PAGO, AMERICAN SAMOA; HCCR No. 10-03, 4/06/2005.

2

3                              -oOo-

4

5         THE COURT:  All right.

6         Counsels, come forward in this case, CR #10-03.

7         All right.

8         Let's have counsel's appearances on the record.

9         MS. SIONE:  Good morning, Your Honors, Julie Sione on

10   behalf of the American Samoa Government.

11        MR. SEITZ:  Good morning, Your Honors, Andrew Stave

12   and Eric Seitz representing the defendant.

13        THE COURT:  Mr. Maez, why are you standing?

14        MR. MAEZ:  Your Honors, I wanted to make a special

15   request to the court if the victim's family could participate

16   and observe?

17        THE COURT:  I will address that in a few minutes.

18        MR. MAEZ:  Counsel for the government and defendant

19   don't have any objections.

20        THE COURT:  I said I will address that in a few

21   minutes.

22        MR. MAEZ: Thank you, Your Honor.

23        THE COURT:  All right.

24

25

1          Well, before we proceed with this hearing, I have a

2    few comments to make.  At this hearing we have two - you did say

3    the defendant was present too on the record, did you?

4          MR. SEITZ:  I'm sorry, yes; I did not say that.

5          Mr. Mahjor's is also present.

6          THE COURT:  Okay, he is present.

7          All right.

8          There are two defense motions that's pending for

9    purposes of this hearing and they both involve a number of

10   witnesses.  Of those witnesses, we've reached the point of

11   hearing any opening statements the attorneys may wish to make.

12   Those witnesses will be excluded from the courtroom except

13   during the time that they are actually testifying.  And while

14   they are outside waiting to testify, they will be directed not

15   to discuss with each other their testimony and anything else

16   about this case.

17         The proceedings in this case up to this point have,

18   for the most part, at least been closed to the public.  There is

19   also an order that's ongoing that prevents the parties and the

20   attorneys and witnesses from talking to any members of the media

21   about this case.  Both of those orders are precautionary

22   measures designed to minimize, if not, prevent matters appearing

23   in the media that are undue and inappropriate to contain undue

24   and inappropriate information about the substance or about the

25   merits, the charge in this matter, and leave that determination

1  to the triar of fact, the jury, when we have a trial in this

2  matter.

3          At this point, I think it is appropriate to continue

4  both of those orders in effect for purposes of this hearing, and

5  that means at least for the witnesses who are from the media.

6          Who is present here from the media; if I can see the

7  hands here?

8      (Hands going up in the courtroom).

9          THE COURT:   Okay.

10         In particular, it's appropriate and the court will

11 order, that after you've completed your testimony you are not to

12 discuss your testimony with any other members of the media and

13 not to publish any reports as to what you actually testified to

14 at this hearing.

15         As I said, that's important because we want to keep

16 the actual determination of the merits to this case to the triar

17 of facts, which would be the jury, and no one else as much as

18 possible.

19         Mr. Maez, the attorneys don't -- no parties have

20 objections to the victim's party family members being present

21 during this hearing?

22         MR. SEITZ:   We don't object.

23         THE COURT:   Government?

24         MS. SIONE:   Nor does the government, sir.

25         THE COURT:   All right.   I will permit that.

1      Again, though I do not want any reports of what takes

2   place during this hearing to appear in the newspaper which

3   identifies members of the victim's family as the source of

4   information, I just want to leave all comments about the

5   substance of the charges to the jury to determine.

6      All right.

7      Having said those things, we will exclude the

8   witnesses at this point and time until they are called to

9   testify.

10      I understand you have two motions pending.  I think we

11   should probably proceed with the venue motion.  Do you wish to

12   make an opening statement regarding that?

13      MR. SEITZ:  I don't mean to make an opening statement.

14   I was going to request, because the witnesses have been waiting

15   since early this morning, that perhaps we do all the evidentiary

16   portion of it and then address them by way of argument once

17   we've taken the evidence?

18      THE COURT:  I'll give you a chance to argue.  I'll

19   give you a chance to make an opening statement if you want; if

20   you don't want, that's fine.

21      MR. SEITZ:  That's not necessary.

22      THE COURT:  Government?

23      MS. SIONE:  The only thing that I would like to point

24   out is that this particular issue has already been before the

25   court.  It's already been litigated and the court has already

1  made a decision.  And for that matter, I think we're covering

2  ground that's already been covered and this is completely

3  unnecessary.

4        THE COURT:  Well, I think defense has raised some

5  other issues that relates to it, so we'll hear it out.

6        All right.

7        Call your first witness.

8        MR. SEITZ:  At this time we'd like to call Robin

9  Annesley, please.

10

11     WHEREUPON,

12

13                    ROBIN ANNESLEY DALTON,

14  **Having been first duly sworn, was examined and testified as
    follows:**

15

16        THE COURT:  Proceed, counsel.

17

18                    DIRECT-EXAMINATION

19

20  BY MR. SEITZ:

21     Q     Would you please state your full name, please?

22     A     Robin Annesley Dalton.

23     Q     And how are you employed?

24     A     I'm employed, pertaining to this case, with Samoa

25  News.

1     Q    And what is your position with Samoa News?

2     A    I am the Editor and Chief and also the Executive Vice

3 President of Samoa News parent company.

4     Q    How long have you held the position of Editor and

5 Chief?

6     A    3½ years.

7     Q    And would you tell the court, please, what is Samoa

8 News?

9     A    It is a daily newspaper that is published in the

10 Territory.

11     Q    And do you know what the current circulation is?

12     A    We publish approximately 4,000 newspapers daily from

13 thirty-eight hundred to forty-two, give or take, depending.  We

14 have 5,000 on line reader subscribers that we track.  We have

15 less than a 5% return on our publication.

16     Q    Do you also accept advertisements?

17     A    Yes.

18     And have you done any surveys or inquiries as to the

19 scope of your readership?

20     A    We have in the process of doing that as we expand our

21 website services.

22     Q    Do you know any of the characteristics of your

23 readership?

24     What kind of people read the Samoa News?

25

1    A    On-island I think we have a very broad readership; On-

2 line we have a lot of military and expat Samoans who serve

3 overseas and also just living overseas.  We also have a large

4 readership from non American Samoans.

5    Q    In terms of the population of this island -- first of

6 all, do you know what the current population is approximately?

7    A    I read every - all the stats, approximately 60,000.

8    Q    And during the period of time that you have been the

9 Editor and Chief, has the newspaper published articles

10 pertaining to this matter concerning Richard Mahjor?

11    A    Yes; from late February until August when the Gag

12 Order was instated, I believe we published approximately 30

13 articles.

14    Q    In addition to publishing news articles, have the

15 newspapers also published editorials?

16    A    We published one editorial about 3 or 4 weeks after

17 the incident had occurred.

18    Q    And in addition to the editorial and news articles,

19 had there also been letters to the editor pertaining to matters

20 which have appeared in the newspaper?

21    A    Yes.

22    Q    At our request, have you prepared a compact disc of

23 all of the articles and newspaper clippings that you could find

24 pertaining to this case?

25

1     A    Yes.   I have with me a disc that was prepared with the

2   30 stories I believe.   We did not supply the letters, that was

3   not – I did not do that.

4     Q    Okay.

5          Can we offer that disc at this time into evidence?

6          THE COURT:   Well, let's mark it.

7          MR. SEITZ:   Yes.

8          MS. SIONE:   Your Honor, the only objection that I

9   would have is that I believe that I am in possession of a disc,

10  but I got it this morning.   I haven't had a chance to look at

11  it.   I have no idea if it's the same one or if it's authentic,

12  but that would be my objection.

13         THE COURT:   Well, you'll have an opportunity to find

14  out.

15         MS. SIONE:   Yes, sir.

16         THE COURT:   Let us know if you have any problem with

17  it?

18         MS. SIONE:   Okay.

19         THE COURT:   Has that been marked exhibit 1?

20         THE CLERK:   Almost, almost there.

21         THE COURT:   This is all 30 articles before the what

22  you call the "Gag Order," or before and after?

23    A    Before we were muffled, sir.

24    Q    This is offered as exhibit 1.

25         We would like to offer it for purposes of this

- 10 -

1  proceeding.

2          MS. SIONE: Just my noted objection.

3          THE COURT:  All right.

4          It will be admitted.

5          We'll afford an opportunity to counsel if she finds it

6  non authentic for some reason.

7  BY MR. SEITZ:

8      Q    In your review of the contents of the compact disc

9  that we've just offered into evidence, were there articles in

10 which Mr. Mahjor allegedly was associated with drug activities

11 in American Samoa?

12     A    Yes.

13     Q    Were there also articles associating him with another

14 murder case in which a body, an unidentified body, was found?

15     A    Yes.

16          MS. SEITZ:  I have no other questions of this witness.

17          Thank you.

18          THE COURT:  Cross-examine?

19          MS. SIONE:  No, I don't.

20          THE COURT:  All right.

21          Thank you.

22          May she be excused?

23          MR. SEITZ:  Yes.

24          MS. SIONE:  Yes, sir.

25          THE COURT:  Call your next witness.

- 11

1          MR. SEITZ:   I call Monica Miller.

2

3      WHEREUPON,

4

5                      MS. MONICA MILLER,

6  Called as a witness to testify, was sworn and testified as

7  follows:

8                    DIRECT-EXAMINATION

9

10  BY MR. SEITZ:

11      Q     Would you please state your full name, please?

12      A     My name is Monica Miller.

13      Q     And Ms. Miller, how are you employed?

14      A     I am the News Director for South Seas Broadcasting.

15      Q     And the South Seas Broadcasting operates the radio

16  station here in American Samoa?

17      A     Yes, sir; it operates on island through KHJ Radio.

18      Q     How long have you been employed as a News Director?

19      A     This is the 5th year, sir.

20      Q     And could you tell us a little bit about your training

21  and background in journalism?

22      A     I've been a journalist for nearly 30 years, done

23  training in Samoa and New Zealand and the United States as a

24  journalist.

25      Q     And have you also gone to journalism school?

1  A  Only one semester at U.C. Berkeley journalism school,

2 but former training school -- but the formal training has

3 basically been on the job in Samoa.

4  Q  Would you tell us a little bit about the radio station

5 for which you serve as News Director?

6  A  Well, it's a 24-hour music station that broadcasts

7 news six times a day and it's heard throughout the main island

8 of Tutuila except for a few pockets in the western district, the

9 valleys that do not receive the signal.

10  Q  And who prepares the news?

11  A  I do, sir.

12  Q  And you also broadcast it?

13  A  That's right, I present it.

14  Q  Are there other radio stations in American Samoa that

15 provide comparable news services?

16  A  Not local news, sir.  I believe that we are the only

17 station that provides a Monday to Friday local news service.

18  Q  Have you done any kind of surveys to determine what

19 kind of listeners you have for your radio station?

20  A  No, sir.

21  Q  Do you have any sources of information as to the kind

22 of listenership that your radio station has?

23  A  Not any set or any formal surveys, but we do know from

24 advertisers basically when they do a sale, and we broadcast the

25 additional what kind of response they get as far as the news --

1    as far as the news.    What I mean, we get people commenting on

2    what's in the news; and also when we make mistakes, we certainly

3    hear about it.

4        Q    Do you, from your advertisers, do you have the sense

5    of degree of prospect which is accorded to your news station?

6        A    I would say that people generally regard us as one of

7    the main resources.    And as far as broadcasting our news, we

8    would be the main local news authority.

9        Q    Okay.

10        In the course of your work for the radio station, have

11    you broadcast any news pertaining to Richard Mahjor on this

12    particular case?

13        A    Yes, sir.

14        Q    And can you tell us with what degree of frequency you

15    cover this case?

16        A    In my view as a broadcast journalist, this was one of

17    the big stories that has occurred here.    And certainly from the

18    time that the parents of the victim came to our station to

19    report about their son missing, we have made this story as one

20    of the top stories.    And in every broadcast from the day that

21    they came to us to ask for information on the radio about the

22    whereabouts of their son up to when the defendants were charged

23    and also since then up to the time when there was a Gag Order

24    issued, I would say that this story has played more than any

25    other court stories we have covered.

- 14 -

1      Q      In a period of time that you've been here?

2      A      Yes, in -- in 4-5 years, 4 or 5 years.

3      Q      We asked you to pull the story and make transcripts of

4  the broadcast, were you able to do that for us?

5      A      Yes, sir.

6      Q      And did you bring those with you?

7      A      Yes, sir.

8      Q      And did you review those transcripts before coming

9  here this morning?

10     A      I had to do them last night, so it was a cursory

11  review of the transcripts.

12     Q      Let me ask you this.

13            Are there news stories that ran in which there was an

14  alleged association mentioned between Mr. Mahjor and drug

15  activities here in American Samoa, allegations to that effect?

16     A      I would say so, sir.

17     Q      And were there also any stories that ran in which

18  there were allegations that Mr. Mahjor might be associated with

19  another murder that occurred for which an unidentified body was

20  found?

21     A      Can you elaborate, sir?

22     Q      Yes.

23            Do you have any recollection that you ran any stories

24  about another murder, not the victim in this case, whose body

25  was found on the mountain who was unidentified?

1        A     Yes, sir.

2        Q     And was Mr. Mahjor ever associated with those events?

3        A     Yes.

4        Q     Do you have the folder of transcripts with you --

5        A     Yes.

6        Q     -- that we asked you to prepare?

7        A     Yes, I do.

8        Q     May I have them, please?

9              May we have these documents marked as exhibit number

10   2, please?

11             THE COURT:  Yes.

12             (Exhibit Number 2 marked for identification

13   purposes).

14             MR. SEITZ:  Judge, I'd like to offer these at this

15   point.  These are the transcripts that we obtained through a

16   Subpoena Ducus Tecum.  We had no way of obtaining them earlier

17   other than by subpoena and so based upon the testimony that

18   these represent, the new stories that they ran, for the purpose

19   of completeness we'd like to offer them into evidence.

20             MS. SIONE:  Your Honors, my objection is I obviously

21   haven't had a chance to even give it a cursory glance and so I

22   would object.  And I don't know what's in that folder, and I

23   would like to have a chance to review it before I can stipulate

24   that it should be admitted into evidence.

25             THE COURT:  Well, we'll admit subject to your

1    review if, you have any objections?

2            MS. SIONE:  Thank you, sir.

3            MR. SEITZ:  Thank you.

4            I have no further questions of this witness.

5            THE COURT:  You may step down.

6            MR. SEITZ:  And she is excused also.

7            THE COURT:  Any other witnesses on this motion?

8            MR. SEITZ:  I am going to call Mr. Mahjor briefly,

9    just to complete my record.

10           With respect to this motion, I would only offer that

11   to prove that he's a United States citizen, if we could simply

12   make an offer of proof if the government would stipulate to that

13   then I don't need to call him at this time.

14           MS. SIONE:  That's fine, if you have something,

15   documentation.

16           MR. SEITZ:  I don't have any documentation, so I was

17   going to have him on the witness stand to testify that he is an

18   American citizen.  If we need to do that, we can do that now.

19           MS. SIONE: I would prefer that, sir.

20           MR. SEITZ:  Okay.

21           THE COURT:  What happened to the passport?

22           Did he have a passport?

23           MR. SEITZ:  Not with him because of his circumstances.

24   We don't know where his -

25           THE COURT:  Normally it gets turned into the attorney

1    General, that's what I'm asking.

2            MR. SEITZ:   That may have happened, we're not aware of

3    where it is.  We'll call him for that purpose just to establish

4    this.

5            THE COURT:   For that purpose?

6            MR. SEITZ:   Yes.

7

8        **WHEREUPON,**

9

10                       **MR. RICHARD MAHJOR,**

11   **Called as a witness to testify, was sworn and testified as**
     **follows:**

12

13                       **DIRECT-EXAMINATION**

14

15   **BY MR. SEITZ:**

16       Q    Would you please state your full name, please?

17       A    Richard Patrick Mahjor.

18       Q    And Mr. Mahjor, you are the defendant in this case, is

19   that correct?

20       A    I am.

21       Q    Where were you born?

22       A    Oakland, California.

23       Q    And are you a United States citizen?

24       A    Yes, I am.

25

1     Q    And have you ever renounced your citizenship in any

2 manner?

3     A    No.

4          MR. SEITZ:  Thank you.

5          I have no further questions for this motion of the

6 witness at this time.

7          MS. SIONE:  If I may, I'd just like to ask two follow-

8 ups so that I can verify this.

9

10                         CROSS-EXAMINATION

11

12 BY MS. SIONE:

13     Q    Would you mind stating your date of birth?

14     A    6/16/71.

15     Q    And did you at one point have a U.S. passport?

16     A    I have never had a U.S. passport but my birth

17 certificate, California driver's license and CI were at my house

18 at the time of the arrest.  The government took control of it.

19          MS. SIONE:  Thank you.

20          THE COURT:  Redirect?

21          MR. SEITZ:  Nothing further.

22          THE COURT:  All right.

23          You may step down.

24          MR. SEITZ:  That concludes the formal evidence that we

25 wanted to offer today on the venue motion.

1    I have four other witnesses outside and I'd like to

2 call them if I could on the other motion so they don't have to

3 wait before we do arguments.

4    THE COURT:  That's fine.

5    MR. SEITZ:  At this time I would like to call Marlon

6 Uli.

7

8    **WHEREUPON,**

9

10    **MR. MARLON ULI,**

11 **Called as a witness to testify, was sworn and testified as**

12 **follows:**

13

14    **DIRECT-EXAMINATION**

15

16 BY MR. SEITZ:

17    Q    Would you please state your name?

18    A    My name is Marlon Uli.

19    THE COURT:  Are we going to need translation?

20    MR. SEITZ:  I don't think so.

21    We need a translator?

22    THE WITNESS:  No.

23    THE COURT:  Okay.

24 BY MR. SEITZ:

25    Q    Mr. Uli, where do you reside currently?

- 20 -

1    A    The village of Leone.

2    Q    And are you employed?

3    A    No, not - not right now.

4    Q    Okay.

5        Mr. Uli, were you incarcerated at the Tafuna

6  Correctional Facility in March of 2003?

7    A    Yes.

8    Q    And were you there when a number of people were

9  brought in with Mr. Mahjor who were alleged to have been

10  involved in a murder with which those individuals were charged

11  in some connection?

12    A    Yes.

13    Q    Do you remember the names of any of those other

14  people, other than Mr. Mahjor, who were brought into the

15  facility when you were there at that time?

16    A    Jake and Paulava Malala, Talofa and Victor.  Oh, and

17  Whiskey, Uatisone Kelemete.

18    Q    And were they housed in an area where you also were

19  housed?

20    A    Yeah.

21    Q    And during that time, did you overhear them say

22  anything with respect to allegations against Mr. Mahjor?

23    A    Yes.

24    Q    What did you hear them say?

25        MS. SIONE:  Objection, Your Honor.

1          That would be hearsay.

2          MR. SEITZ:  Well, for purposes of this motion it's

3   not hearsay because they are statements basically against

4   interest.  They have made statements, which according to you,

5   they are going to contradict those statements with respect to

6   their involvement in criminal activities.

7          THE COURT:  All right.

8          Overruled.

9          Go ahead.

10  BY MR. SEITZ:

11     Q    What did you overhear them say?

12     A    I heard them plotting you know, saying that they're

13  going to put the blame on Richard Mahjor for the crime that was

14  committed because they said that the C.I.D. only - they're only

15  after Richard Mahjor.  So they said they were going to plan to

16  put all of them to have the same story and go against Richard

17  Mahjor.

18     Q    And did you hear them having those discussions?

19     A    What's that?

20     Q    Did you hear those conversations on more than one

21  occasion?

22     A    Yeah.  It was said -- they spoke.  Because Richard

23  doesn't understand Samoan, so they were talking in Samoan about

24  what they were going to do to turn against -- I mean you know,

25  to put the blame on Richard Mahjor.

1      Q      From that – from that conversation that you overheard,

2    --

3      A      Yeah.

4      Q      -- did you obtain the impression, any impression,

5    about whether Mr. Mahjor was actually involved in the events

6    that they were discussing?

7      A      Well, from what they say, they say that Richard didn't

8    do anything but I guess getting rid of -- I don't know about the

9    car or something; but he wasn't involved in the actual beating

10   of Wyatt.

11     Q      Okay.

12            Thank you.

13            I have no further questions of this witness.

14            THE COURT:   Cross?

15

16                         **CROSS-EXAMINATION**

17

18   BY MS. SIONE:

19     Q      So let me clarify.

20            That was based on your impression, or that was based

21   on what you actually heard?

22     A      What I actually heard.

23     Q      So let me just ask you this.

24            Why should the court believe what you're saying?

25     A      I don't know.

1      Q      When you were incarcerated, what were you incarcerated

2  for?

3      A      First-degree murder.

4      Q      And in the course of your charge that was pending, did

5  you give statements to the police about your involvement in that

6  murder?

7      A      No.

8             Oh, I did.  I gave a statement, but yeah, I—yeah.  I

9  remember writing a statement.

10     Q      And the statement that you remembered writing, that

11 statement actually wasn't true, was it?

12     A      No.

13     Q      And do you recall approximately six weeks or so

14 testifying under oath about your involvement in that matter?

15     A      Yes.

16     Q      And do you recall testifying under oath that you were

17 actually the one that committed that murder?

18     A      Yes.

19     Q      So let me ask again, why should the court believe what

20 you're saying now?

21            MR. SEITZ:  I'm going to object.

22     A      I don't know.

23            MR. SEITZ:  That's argumentative and he's already

24 answered it.

25            THE COURT:  Well, I'll sustain that on that ground.

1  BY MS. SIONE:

2      Q     When you first heard these people talking, what date

3  was it?

4      A     I don't remember the actual date, but it was like

5  within the first week they were – they were brought into the

6  correctional facility.

7      Q     And do you recall what month that was?

8      A     March.

9      Q     So it was within one week of when they were

10  incarcerated?

11      A     Yes.

12      Q     And when you're saying "they," who again are you –

13      A     Paulava, Jake, and Whiskey, because they transferred

14  Talofa and Victor on like -- on that first week they transferred

15  them to Bravo, Bravo Unit.

16      Q     And where were you?

17      A     I was in the Maximum Facility.

18      Q     So these other three were in the Maximum Facility with

19  you?

20      A     Yes.

21      Q     Where were you when you overheard this conversation?

22      A     In my cell.

23      Q     And where were they?

24      A     In their cell.

25      Q     And where are their cells in relation to your cell?

1    A    It's like maybe – well, my cell's right here and this

2  is Paulava's cell and Jake's cell where you're sitting at.  It's

3  like a round house.

4    Q    And you testified they were speaking in Samoan?

5    A    Yes.

6    Q    Did you report what you heard to anybody?

7    A    About?

8    Q    That they were plotting to frame some – somebody who

9  maybe innocent?

10    A    Not that I know of.

11    Q    You don't think you reported it?

12    A    No.

13    Q    You had a chance to get to know Mr. Mahjor while you

14  were both incarcerated, is that true?

15    A    Yes.

16    Q    And you and Mr. Mahjor became friends, is that true?

17    A    What's that?

18    Q    You guys became friends?

19    A    Yeah, you could say that.

20    Q    And you and Mr. Mahjor were involved in a situation

21  that involved illegal use of cell phones inside the jail, is

22  that right?

23    A    No.

24    Q    You weren't involved?

25    A    I never got a cell phone.

1    Q    Did Mr. Mahjor to your knowledge get caught with the

2  cell phone?

3    A    I don't know; I was out.

4    Q    Do you recall who provided the cell phone to Mr.

5  Mahjor?

6    A    Not that I know.

7    Q    Is it possible that you provided the cell phone to

8  him?

9    A    Who?

10    Q    You.

11    A    No, I didn't.

12    Q    Are you still friends with Mr. Mahjor?

13    A    Well, I haven't seen him since I've been out, so I

14  still consider him a friend.

15         MS. SIONE:  I have nothing further, sir.

16         THE COURT:  Any redirect?

17         MR. SEITZ:  No.

18         THE COURT:  All right.

19         You may step down.

20         MR. SEITZ: He also may be excused.

21         THE COURT: All right.

22         You're excused.

23         MR. SEITZ: At this time I call Mr. Peno.

24         THE COURT:  Who's that?

25         MR. SEITZ:  Peniamina Peno.

1              THE COURT:  Mr. Peno.

2

3         WHEREUPON,

4

5                        MR. PENIAMINA PENO,

6  Called as a witness to testify, was sworn and testified as
   follows:

7

8                        DIRECT-EXAMINATION

9

10  BY MR. SEITZ:

11        Q     We do need translation for this witness.

12              THE COURT:  That we will.

13        (Translation)

14  BY MR. SEITZ:

15        Q     Would you please state your full name, please?

16        A     Peniamina Peno.

17        Q     Mr. Peno, where do you currently reside?

18        A     Aua.

19        Q     And are you employed?

20        A     Yeah.

21        Q     What do you do?

22        A     I work in the warehouse of Samoa Packing.

23        Q     Mr. Peno, in March of 2003 were you in jail?

24        A     Yeah, that is correct.

25        Q     And where were you being housed?

1      A    Max.

2      Q    And while you were there, were there a number of

3  people including Mr. Mahjor and other people, who allegedly were

4  involved in an offense, brought into the same facility where you

5  were being housed?

6      A    That is correct.

7      Q    Did you hear any of those individuals talking among

8  themselves about what allegedly happened in the offense

9  involving the killing of Wyatt Bowles?

10     A    That is correct.

11     Q    Do you remember the names of any of the people who you

12  heard discussing that matter?

13     A    Yes.

14     Q    Would you state the names that you remember, please?

15     A    Paulava and Jake.

16     Q    Anybody else?

17     A    Talofa and Victor.

18     Q    That's it?

19     A    Yes.

20     Q    And what were those individuals saying?

21     A    They were going to blame the palagi for what had

22  happened.

23     Q    And by the "palagi," whom do you mean?

24     A    Richard.

25

1    Q    Did they also say anything about what actually did

2    happen in this incident?

3    A    Yes.

4    Q    What did they say?

5    A    They said that they killed him and Richard Mahjor

6    wasn't there.

7    MR. SEITZ:  Thank you.

8    I have no further questions.

9    THE COURT:  Cross-examine.

10

11    CROSS-EXAMINATION

12

13    BY MS. SIONE:

14    Q    Why were you in TCF?

15    A    Murder.

16    Q    What happened with - I'm sorry.  Let me back up.

17    Were you awaiting trial for murder, or were you

18    serving time for a conviction of murder?

19    A    What's your question?

20    Q    Were you waiting to go to trial for murder, or had

21    you already been convicted of murder in March of 2003?

22    A    I was serving time.

23    Q    Did you have a jury trial, or did you plead guilty?

24    A    Yes.

25    Q    Yes, you had a jury trial?

1    A    Yes.

2    Q    When you had a jury trial, did you take the stand and

3  testify?

4    A    Yes.

5    Q    Do you remember what year that was in?

6    A    '97, the month of May in the year 1997.

7    Q    So you overheard these four people talking, is that

8  correct?

9    A    That is correct.

10    Q    Where were you when you heard this conversation?

11    A    I was in Bravo.

12    Q    Where in Bravo?

13    A    Where I was locked up in Bravo.

14    Q    Inside your cell?

15    A    Yes.

16    Q    And where were those men?

17    A    Our cells were close to each other, they were right

18  next to each other.

19    Q    Was the conversation in English or Samoan?

20    A    In Samoan.

21    Q    Do you remember when the conversation took place?

22    A    No, I don't remember.

23    Q    Was it in 2003?

24    A    Yes, that's correct.

25    Q    Was it during the summer month of 2003?

1    A    No.

2    Q    Was it before the summer month, or after the summer

3  month?

4    A    After the summer.

5    Q    And let me clarify because the summer might -- summer

6  might be different to you then what I mean.

7         I'm sorry; was it before, or after Flag Day?  Let's

8  try that.

9    A    After the Flag Day.

10   Q    When you heard this conversation, did you tell anybody

11 about what you heard?

12   A    No.

13   Q    What about Richard Mahjor, the palagi, was he around

14 when this conversation happened?

15   A    No.

16   Q    Did you tell Richard Mahjor about what you overheard?

17   A    No.

18   Q    Did you discuss what you heard on that day with Marlon

19 Uli who just walked out?

20   A    Yes, when we were in jail.

21   Q    Have you discussed it with Marlon - I'm sorry, let me

22 back up.

23        When were you released?

24   A    April.

25   Q    Of 2004?

1       A    Yes.

2       Q    And Mr. Uli was released I believe sometime in October

3  2004, does it sound right?

4       A    I don't know.

5       Q    Did you and Mr. Uli discuss it after you both were out

6  of jail?

7       A    No.

8            MS. SIONE:  I have nothing further.

9            MR. SEITZ:  No further questions.

10           THE COURT:  All right.

11           You may step down.

12           MR. SEITZ:  He may be excused.

13           The next witness is Talavou Letoi.

14

15      **WHEREUPON,**

16

17                         **MR. TALAVOU LETOI,**

18  **Called as a witness to testify, was sworn and testified as**
    **follows:**

19

20           THE COURT:  What about translation in this case?

21           MR. SEITZ:  Do you need translation?

22           THE WITNESS:  I'm fine.

23

24

25

1                          DIRECT-EXAMINATION

2

3    BY MR. SEITZ:

4        Q    State your name, please?

5        A    Talavou Letoi.

6        Q    And where do you currently reside?

7             Where do you live?

8        A    Leone.

9        Q    And are you employed?

10       A    Yes.

11       Q    How are you employed?

12       A    I'm working at my mom's retail store and Laundromat.

13       Q    Were you incarcerated back in March of 2003 when Mr.

14   Mahjor and several other individuals, who were allegedly

15   associated with him, were brought into the facility?

16       A    Yes.

17       Q    And do you remember any of the names of those other

18   individuals?

19       A    I'm sorry, I can't recall.

20       Q    Were those other individuals all Samoan?

21       A    Yes, they were.

22       Q    And do you remember hearing them discuss or talk about

23   what had happened in the incident in which they were charged?

24       A    Yes.

25       Q    Do you remember what you heard them say?

1    A    Yes, I remember.

2    Q    What did they say?

3    A    They said that they're going to put the blame on Mr.

4  Richard and set him up.  And they also said that and I also

5  asked if Mr. Richard was there during the incident and they told

6  me that, no, he wasn't there.  He went out to get some dinner

7  and when he came back the kid was wrapped up already and all

8  that stuff.

9    Q    And this conversation that you had with them, is it in

10  English or Samoan?

11    A    Samoan.

12    Q    And where were these individuals in relation to you

13  when you were housed at the facility?

14    A    In Bravo.

15    Q    Okay.

16         And do you remember this occurred shortly after they

17  were brought into the facility in March?

18    A    No, I don't remember.

19    Q    You can't remember exactly when it occurred?

20    A    No.

21         What; the story?

22    Q    When the conversation occurred?

23    A    Oh, the conversation?

24         MR. SIONE:  And I would just like to interject an

25  objection.  That was a leading question about two questions ago.

1          MR. SEITZ: Let me ask the question again.

2     Q    Do you remember whether this conversation that you

3  overheard took place?

4     A    No, I don't.

5          MR. SEITZ: I have no further questions of this

6  witness.

7          THE COURT:  Cross?

8

9                         CROSS-EXAMINATION

10

11  BY MS. SIONE:

12     Q    Do you speak fluent in Samoan?

13     A    Yes, ma'am.

14     Q    Why were you in TCF?

15     A    For driving under the influence.

16     Q    When you heard what you heard, did you tell anybody?

17     A    Yeah, a few people.

18     Q    Who?

19     A    I can't really remember.

20          MS. SIONE: I have nothing further.

21          THE COURT:  Redirect?

22     .    MR. SEITZ:  No.

23          THE COURT:  All right.

24          You may step down.

25          Can he be excused?

1       MR. SEITZ:  Yes, please.

2       THE COURT:  You're excused.

3       THE WITNESS:  Thank you.

4       MR. SEITZ:  The last witness is Jimmy Lee.

5

6       **WHEREUPON,**

7

8                       **MR. ALAN JIMMY LIM,**

9  **Having been first duly sworn, was examined and testified as**
10 **follows:**

11      THE COURT:  How about translation in this case?

12      THE INTERPRETER: He says in English.

13

14                      **DIRECT-EXAMINATION**

15

16 BY MR. SEITZ:

17      Q    Would you please state your full name, please?

18      A    Alan, Jimmy, Young Lim.

19      Q    And Mr. Lim, where do you currently reside?  Where do
20 you live?

21      A    Tafuna.

22      Q    And were you in the correctional facility back in
23 March of 2003?

24      A    Yeah.

25

1    Q    And at that time, were you there when Mr. Mahjor and

2    several other individuals, who were charged in an offense he was

3    allegedly involved in, were brought into the facility?

4    A    Yes, sir.

5    Q    And do you know a man by the name of "Talofa?"

6    A    Yeah.

7    Q    Did you ever have any conversations with Talofa about

8    what had happened in this incident?

9    A    Sometimes, yeah.

10    Q    Okay.

11    You've got to speak into the microphone so everybody

12    can hear you.

13    Can you tell us what Talofa said to you?

14    A    We only talked once, but he said something about

15    Paulava was, Paulava Malala was pressuring him and telling him

16    that put all the blame -- he said the words "white man." He's

17    referring to Richard. That's about it.

18    Q    Okay.

19    In that conversation, did Talofa seem to you to give

20    you indication that he wanted to put the blame on Mr. Mahjor?

21    A    No.

22    Q    What did he tell you about that?

23    A    He said that -- he said something about he's scared;

24    that's it.

25    Q    Did he tell you who he was scared of?

1     A    No.

2          MR. SEITZ:  Thank you.

3          No further questions.

4          THE COURT:  All right.

5          Cross?

6

7                     **CROSS-EXAMINATION**

8

9 BY MS. SIONE:

10    Q    Why were you in TCF?

11    A    Burglary.  I'm a thief.

12    Q    I'm sorry?

13    A    Burglary.

14    Q    Were you waiting for trial, or had you already been

15 convicted?

16    A    I had been convicted.

17    Q    How long were you sentenced for?

18    A    Seven years.

19    Q    Did you have a jury trial, or did you plead guilty?

20    A    Plead guilty.

21    Q    Did you tell anybody about your conversation with

22 Talofa?

23    A    No.

24          MS. SIONE:  I have nothing further.

25          MS. SEITZ:  Nothing further from this witness.

1          THE COURT:  All right.

2          You may step down.

3          Thank you.

4          MS. SEITZ:  He may also be excused.

5          THE COURT:  And you may be excused.

6          MR. SEITZ:  That's all the evidence we have to offer

7   at this time.

8          THE COURT:  All right.

9          What's next?

10         MR. SEITZ:  Well, if we could return to the venue

11  motion, I'd like to present my argument then on that motion.

12         THE COURT:  All right.

13         MR. SEITZ:  I am aware as the attorney general has

14  indicated that there was a previous motion.  I've reviewed the

15  motion, previous motion; I've reviewed the courts order, and I

16  want to emphasize to the court that we are not seeking to repeat

17  what was argued previously.

18         As I read that motion, it was a very limited motion.

19  It dealt only with the extent of publicity and attached only

20  some of the articles.  It did not talk about the specific

21  prejudicial nature of those articles and I think, therefore,

22  there was a very limited record that was made, and we have

23  sought I think to distinguish the motion we're making here today

24  by presenting so much broader and much more substantial concerns

25  that that motion raised.

1    The Court's order in denying that motion indicated

2   that there was no evidence that would raise to the level of the

3   court presuming prejudice at that conjuncture that there was no

4   indication of prejudicial coverage, and I think that was the

5   foundation upon which the motion was denied based upon the

6   articles that were tendered.

7    Because, as the court commented in its written order,

8   those articles really appeared to be mainly in the nature of

9   fair comments on the fact that a case was proceeding and that

10  there were allegations and that the proceedings were going

11  forward.

12    The record on this motion, I would submit to you, is

13  far more substantial.  When you have the opportunity to review

14  the transcripts and what's contained on the disc, you will see

15  that there are a number of articles in which Mr. Mahjor is

16  referred to, not merely by virtue of the allegation that he

17  committed or was involved in the murder charge in this case, but

18  that he is a drug kingpin; that he's alleged to have been

19  involved in the importation of substantial amounts of drugs;

20  that he's the leader of a faction or a gang of people who were

21  involved in drugs.  And all of that for which there has never

22  been any discovery referred to us or any evidence offered, it

23  was all played out in the media.  So it portrayed him in a

24  certain manner which has to do with allegations which will never

25  be presented to any jury at trial in this case.

1          Secondly, as you've heard there are articles about

2    another alleged murder which he was associated with, which he's

3    never been charged, and basically the whole specter was created

4    that he is involved routinely more than once in killing people

5    because of drug activities which he allegedly was heavily

6    implicated in and involved in.  That is the nature of the

7    publicity to which we fundamentally object.  So it's not merely

8    as the two witnesses testified that there was a substantial

9    saturation of publicity in this small community.  It is also

10   that that publicity contained articles about other offenses,

11   which he is not charged with and for which there will be, as far

12   as we could tell, no evidence at trial that a jury would ever

13   hear, and yet the pool has been infected, has been polluted by

14   detailed information about those other allegations.

15          There also is the specter in this case which you've

16   also heard from testimony this morning about the fact that Mr.

17   Mahjor is a Caucasian, a palagi, he's an outsider.  And there is

18   clearly an aspect of this case if it goes to trial -- if it goes

19   to trial where the individuals who testified against him are

20   going to be portraying him in some manner in tailoring their

21   testimony because he is an outsider and that will play in some

22   manner to a local jury we believe, which will have a prejudicial

23   impact on his ability to find and to have a fair jury panel

24   selector.

25          And finally in the record for this motion we have

1   raised, and I would ask you to take judicial notice of the

2   affidavit and of the materials that I've cited in the memorandum

3   from various anthropologists who I have cited to and repeated

4   for you, and I'm sure you're familiar with those, with that body

5   of information, that there are concerns about the applicability

6   of the jury trial of this culture to begin with.  And I want to

7   address that from the standpoint of a legal decision which I've

8   raised them.

9          This is not a motion which is merely based upon a few

10  articles that appeared in the newspaper which may have called to

11  the attention of the population here in American Samoa that

12  there is a controversial and a very serious case pending.  These

13  were articles which raised issues which could have a very

14  serious and we believe already have had a significant impact on

15  whether or not a fair jury can be chosen to try this case.  It

16  is the government's responsibility and the court's

17  responsibility.  And I cited to you cases to ensure that once

18  this defendant asks for a jury trial, which he has requested,

19  that he's entitled to a fair trial by a jury.

20         And in that regard I've also argued to you in my

21  motion, which unfortunately the government has not responded to,

22  that a jury trial in this context for an American citizen in

23  American Samoa has to be by a jury of twelve, not six.

24         Now, we've researched that issue thoroughly.  I

25

1  invited the government to come up with some other research for

2  us.   It is permissible for states under the United States

3  Constitution to have jury trials of less than twelve if the

4  State legislature passes a law that allows for that.   However,

5  it is only permissible in the territory for that to occur if the

6  government, the United States Government, Secretary of the

7  Interior or somebody else, has specifically and explicitly

8  authorized triar by less than twelve.

9          In our view, you cannot under current law, provide a

10  jury trial for Mr. Mahjor, which includes twelve jurors.   That's

11  not your practice and I don't find any legal authority for that.

12  The absence of that in our view would deny him the effective

13  right to a trial by jury to which he is constitutionally

14  entitled, as we understand the law.

15          And as I say, we've been able to find no authority to

16  the contrary and I'm not aware that that issue has ever been

17  litigated previously, and unfortunately the government did not

18  respond to that, so I don't know if there's any contrary

19  authority out there.   I can only tell you that we have found

20  none.

21          Once we raise an issue pertaining to the ability of

22  the government to provide an unbiased, fair, and impartial jury,

23  it is incompetent upon the government in some manner and degree

24  upon the court to provide remedies to address the concerns that

25  we have raised.

1          Now, I'm aware that at least two remedies have been

2   provided here and probably three.  The first remedy is the order

3   precluding subsequent publicity, which is fine, but it does not

4   undo the implications of the previous publicity.

5          The second typical kind of remedy that's provided is

6   that the trials are delayed.  Well, this case has been delayed

7   and we appreciate that.  We have asked for delays in order to

8   facilitate my being able to come into the case.  But at a

9   certain point where an individual is incarcerated, delay is not

10  a feasible remedy, and further delays to allow the prejudicial

11  implications of the publicity to disobey would not be the

12  acceptable remedy in this case, so long as Mr. Mahjor continues

13  to be incarcerated.

14         If he were not incarcerated, that would be a different

15  question, but he is still incarcerated and that remedy therefore

16  does not present itself as particularly helpful in these

17  circumstances.

18         And the third kind of remedy that typically was

19  provided is for enhanced vire dire.  And I understand from the

20  court's previous order that certainly that's on the table, and

21  that's something we could do to determine what the effects have

22  been of the publicity, but we don't need to go onto that point.

23  We don't need to actually empanel a jury and question jurors to

24  know that there already has been prejudicial information out

25  there which, in this small community, is going to be impossibly

1  undo.  And we already have case laws and other authorities which

2  have raised questions about whether we could impanel a fair jury

3  in this case anyway and we do not have to get to that point.

4          In our belief, the rightness of a motion for change of

5  venue is certainly now and we should not have to wait and do all

6  the preparations for having a trial here when in fact we believe

7  it's a matter of law that a change of venue is required.

8          I've cited you several cases.  I cited you first of

9  all the *Lincoln* case, which is a comparable case in a comparable

10  venue, which was decided by the 9th circuit.  It happens to have

11  been the case, which I tried three times when it was finally

12  done.  But in that case, Mr. Lincoln was charged with a very

13  highly publicized murder, murder for hire in the island of Maui.

14  At that time the population was very comparable to what the

15  population was here.  That murder was committed in 1979 and it

16  was by far and away probably still the most notorious crime that

17  was ever committed on that island; two people were killed and

18  one person survived barely, and it was clearly a hit and my

19  client, Mr. Lincoln, was charged with having committed that, and

20  the papers and the news were saturated for a long time.

21          When we impaneled the jury a year later for the first

22  trial, we impaneled 16 jurors; 14 of the 16 jurors have been

23  subjected to the publicity about the case, but they all got up

24  on the stand and said we can put that aside.  They all said we

25  can be fair jurors.  And the trial judge, over our strenuous

1    objections, accepted their statements in the face of a record

2    which contained the same kind of publicity, the same kind of

3    statements about an individual who was charged in the crime,

4    detailing very lucrative events about other activities in which

5    he was alleged to have been associated during the course of his

6    life.

7            Mr. Lincoln went to trial with that kind of jury.  He

8    was convicted and the Hawaii Supreme Court refused to hear the

9    case.  He made media and the Court of Appeals affirm and we

10    filed Federal Habeas Corpus.  And among the reasons for setting

11    aside, the 9th circuit quite clearly states that the record in

12    and of itself raised very serious concerns about whether our

13    motion for a change of venue should have been granted, but it

14    was denied.

15            We tried the case the second time and we were not able

16    to get it moved from Maui the second time.  It was again

17    reversed and finally it was tried in Honolulu for the 3rd time

18    and at that time Mr. Lincoln was acquitted.  That is factually

19    all the days that I've been able to find as close to this

20    situation.  There was clearly a record.

21            It was incompetent upon the court to change the venue

22    we believe, and unfortunately, Mr. Lincoln sat in jail for

23    twelve years before he finally was acquitted in a trial that

24    eventually occurred in a venue where we were able to pick a fair

25    and impartial jury.

1    We don't want Mr. Mahjor to go through that kind of a

2    Wait.  Guilty or innocent, he should be entitled to receive a

3    trial by twelve unbiased jurors at the earliest possible time.

4    I've also raised with you and I've cited to you the

5    *King* case, which I'm sure you're familiar with.  Mr. King was

6    charged here with failure to pay taxes, evading taxes that were

7    overdue and he complained after his trial that he had not been

8    afforded the right to a jury trial.  And this was the case from

9    the 70's before the right to a jury trial existed at all.  And

10   he went to the District Court in Washington, D.C. and eventually

11   to the Court of Appeals, The United States District Court for

12   the District of Columbia.  And in the two cases that resulted

13   from that incident, the Court of Appeals first of all expressed

14   serious problems about whether or not he should have been

15   afforded a jury trial and remanded; founded in the lengthy

16   opinion that he was entitled to a jury trial.  And without being

17   afforded a proper jury trial that no sentence could be executed

18   against Mr. King.  The district court affirmed that part of what

19   the Court of Appeals found, but the district court at some

20   length evaluated the defendant's objection to the whole concept

21   of a jury trial and in very detailed findings, in theory at

22   least, found that the institution of a jury trial was consistent

23   with the institution in Samoa that would not interfere with and

24   would promulgate the interest of having a fair trial.  And so

25   basically, the district court said you have to give people jury

1   trials.  And we don't find that, from the record in our case,

2   that there is any cultural impede in Samoa doing that in this

3   case because of the nature of publicity, because the fact that

4   there are six or seven Samoan witnesses who are alleged to have

5   been co actors in one capacity or another who apparently are

6   collaborated in some manner to provide testimony against Mr.

7   Mahjor.

8           There are cultural issues and there are aspects about

9   this case which we believe make it virtually impossible for six

10  or twelve unbiased jurors to be impaneled in this case.  We

11  believe that there would have been so much discussions from

12  local villages and responses from the public that so much

13  publicity has already been created through local institution

14  existing that -- and it will be.

15          In fact, we have been told by everybody we have

16  consulted; anthropologist, lawyers, former judges, some of whom

17  have affidavits in this case, that the ability to impanel a fair

18  and impartial juror for Mr. Mahjor in this situation is

19  inconsistent with what those individuals know about Samoan

20  culture and about life on this island and this territory at this

21  particular time.

22          If those concerns are real, whether there proven or

23  not, those -- if those concerns certainly are real then it is

24  incompetent we believe upon this court and upon the Government

25  of American Samoa to find another location, whatever the cost

1  factors may be, to try this case where it can be said when all

2  is done, no matter what the verdict is, that Mr. Mahjor was

3  given his constitutional right to a fair and impartial jury.

4          We believe that based upon the state of the record at

5  this point and particularly because the government has not

6  really joined issue in this case on this motion on any of these

7  questions, they haven't presented any affidavits, they haven't

8  really as I said responded to the motion, except I assume

9  there's going to be an oral response, we don't believe that the

10 government has even taken these issues seriously and that is

11 disturbing because it is the government's right.

12          It is all of our rights as attorneys to see to it that

13 an individual charged in such a serious circumstance is afforded

14 a right to a fair and impartial trial.  And there are issues in

15 this case that the finders of fact are going to have to decide,

16 which we don't believe can be decided with any degree of

17 assurances, that the decision will have been unbiased and

18 unprejudiced.

19          For all of those reasons, we would request the court

20 grant the motion.  And what we would ask the court is that it

21 issue an order requiring that the venue in this case be

22 transferred within a certain specified period of time to another

23 location where a fair and impartial jury can be assured to Mr.

24 Mahjor.  And if those arrangements are not made within that

25 specified period of time that he be released from custody.

1           Thank you.

2           THE COURT:  Transfer where?

3           MR. SEITZ:  Judge, that's a problem.

4           I understand that –

5           THE COURT:  Well, I want to know what you're solution

6    to it is.

7           MR. SEITZ: First of all, let me say it's not my

8    problem.  The problem is (and I'm not going to avoid the answer)

9    but I'm telling you it is the government's problem.  They're the

10   ones who want to try him.

11          THE COURT:  I'm not suggesting it's your problem.  I

12   just want to know what your solution is.

13          MR. SEITZ: My solution -- and I've seen what happened

14   before.

15          First of all, a request can be made of a federal

16   government to try this case.  And as far as I know, no request

17   has been made.  This is a federal territory.  Theoretically, a

18   murder that occurs in the federal territory can be subject to

19   federal jurisdiction.

20          If the federal court is inclined to exercise that

21   jurisdiction so theoretically at least, Mr. Mahjor could be

22   tried in Washington D.C. where there is some precedent -- and I

23   attached an order from a court in Hawaii -- there is some

24   precedent for trying the case in Hawaii.

25          The government of American Samoa and its

1  representatives in Congress, or through the Secretary of

2  Interior, could certainly make a request and make efforts to

3  have this case tried in a federal court.  To my knowledge they

4  have not done that.

5         Secondly, there are instances that I'm aware of where

6  cases have been transferred from one state to another.  That has

7  happened at the request, again, at the executive level; where a

8  request is made because a case cannot be tried in a particular

9  location for one reason or other, that based upon comedy, not

10  upon any legal arrangement that exist, but upon comedy, that a

11  government will request undoubtedly at its own request that a

12  case be tried at another location.  We certainly waive that

13  right if the government would make efforts to make those

14  contacts and have this case tried in a jurisdiction elsewhere.

15         We believe that there is a potential and a possible

16  way in which that can be done, and it may require an enactment

17  by the legislature and it may require, as I say, some

18  expenditure and some commitment funds to do that, but it is even

19  if than he is to receive a fair and impartial trial.

20         THE COURT:  All right.

21         Ms. Sione?

22         MS. SIONE:  Your Honor, that's a lot for me to have to

23  respond to, and I am going to do my best to keep it brief and

24  try to follow some kind of an order.

25         Let me first start out by saying first of all, the

1  problem is Richard Mahjor and his alleged crime are no more

2  special than any of the other people who are here who are

3  accused of committing a murder.  I mean he's no more special;

4  he's no less special.  He's accused of committing a crime.  The

5  crime occurred here.

6          Mr. Mahjor's availed himself of the Territory of

7  American Samoa.  He came over here voluntarily.  He was living

8  here.  He was -- maybe he was working here.  He was -- whatever

9  he was doing here, he was here by his own choice, and the

10 alleged crime happened here.

11          And that argument about, that because he's palagi or

12 because he's white that that's somehow is going to mean he's not

13 going to get a fair trial, I just can't help but think of a

14 Samoan, let's just say, a Samoan man; a Samoan person who is in

15 Oregon, in rural Oregon, and is indicted on let's say federal

16 drug charges and had to go to court in Oregon with a non Samoan,

17 probably palagi jury; non Samoan, probably palagi witnesses.  He

18 would maybe even try to make those same arguments.  And some of

19 them might be with the jury or -- but he would be unsuccessful.

20 I mean the bottom line is you can't pick and choose where you

21 want to have your trial.  Wherever the crime occurred, for the

22 most part, that's where the trial needs to take place.

23          Regarding the argument about the six person verses

24

25

1    the twelve-person jury, I would love to be able to make an

2    intelligent response to that, but unfortunately I didn't know we

3    were going to be talking about that.

4            I have reviewed, even as he was talking, I have

5    reviewed his motion. I have reviewed his affidavit. That issue

6    is not raised and so I didn't prepare to respond to it. The

7    only place I can find it is in the very, very back under tab 16,

8    which is like, I don't know, like 30 pages. There's a paragraph

9    about a trial by six jurors and that's in the Memorandum of Law,

10   but it's not in the motion. It's not in the supporting

11   affidavit. So if the court is going to seriously consider that

12   request, I would like to be given leave so that I can research

13   it and can respond.

14           And again, before I address the media situation,

15   counsel asked the court to take judicial notice of one of these

16   affidavits that was submitted by, I think it's a stretch to say,

17   by a cultural anthropologist. It's an affidavit submitted by

18   somebody and I would absolutely be oppose to that. This is not

19   an appropriate thing for the court to take judicial notice of.

20           THE COURT: What affidavit are you talking about?

21           MS. SIONE: It's affidavit number -- I don't even --

22   give me just a moment, sir, and I'll find it.

23           It's the affidavit that's in the back under tab 16

24

25

- 54

1    with all the other information.  It's the affidavit – and excuse

2    me if my pronunciation, Loimane Lefiaui, and I'm sure I'm

3    pronouncing that wrong and I'm sorry.

4          It's an affidavit of a person who thought the person

5    was born – well, I don't know whether here or in Western Samoa.

6    But if the person is Samoan, received a bachelors degree, got a

7    masters degree in teaching with the emphasis of anthropology,

8    nearly completed a doctorate degree program but no indication

9    whether he actually completed, and also a doctorate program in

10   cultural anthropology in Honolulu University and there's no

11   information as to whether or not -- first of all, there's no

12   resume attached, so I have no idea what he's done

13   professionally; no information whether or not this person ever

14   even testified at a trial on this issue, and there's no

15   information of whether they have been published.  There's

16   nothing.  So I would have clear problems with qualifying this

17   person as an expert.

18         And also, this person was saying that their not

19   personally familiar with any of the facts or circumstances and

20   they can't express any opinions about the proceedings in

21   American Samoa.  Yet, I believe counsel characterizes this as

22   being in support of his position that this person can't get a

23   fair trial, so that clearly misstates what this affidavit stands

24   for.

25         Although I object to the affidavit in its entirety, I

1    also would like to point out, counsel also misstated the media

2    people.  He said that the media people agreed that there were

3    substantial saturations and that's surely not what I heard from

4    where I was sitting.

5        What I heard (I'm going to shift gears and talk about

6    that real quick) is that the Samoa News publish between thirty-

7    eight hundred and forty-two papers, give or take, on a daily

8    basis for a population based on her estimate.  I don't know if

9    this is accurate, but it sounds about right of a population of

10   60,000 people.  So in average of 4,000 papers for 60,000 people,

11   how is that saturation; number one.

12       Number 2; she talks about there are approximately

13   5,000 people who subscribe to the online services, but followed

14   up with that by saying many of them are military or expats or

15   non American Samoans, which means they are not potential jurors.

16   So based on the information from Samoa News, clearly there had

17   not been saturations on this issue, and again I would just renew

18   my objection.

19       I have not had an opportunity to review the evidence

20   and I would like to note that all of these articles that are

21   attached to the affidavits submitted by defense counsel, to the

22   best of my examination, I have no idea when these were

23   published.  I wasn't here, so I can't guess.  And based on the

24   face of these, I have no idea when they were published.  I don't

25

1  know if the disc is going to have the same problem or not.  I

2  hope not.

3         In counsel's affidavit, specifically, I am talking to

4  or referencing paragraph 8.  Counsel promises that there would

5  be new additional and substantial considerations that were not

6  previously printed in court.  And although I wasn't present at

7  the prior court proceedings, I think the motion and the courts

8  order are very, very clear this was litigated; this was talked

9  about.  And I just fail to see anything that is new, additional,

10  or substantial.

11         And if for all of those reasons, I think that although

12  I would, if the court is going to consider the six verses twelve

13  person, I would like leave to brief that issue.  And for all of

14  those reasons, I think the defendant's motion should be denied

15  in its entirety as it was approximately one year ago.

16         THE COURT:  Mr. Eric?

17         MR. SEITZ:  Just briefly.

18         First of all, let me tell you that this motion

19  originally was filed I think in late January.  So it's been more

20  than two and a half months as the government has had the motion.

21         I understand there had been changes in the personnel

22  in the attorney general's office and I'm sorry that that had

23  created some confusion apparently, but clearly the opportunity

24  to respond to this motion was there and hasn't been responded

25  to.

1          The portion about the six-member jury is thoroughly

2    brief.  The cases were all there; that's not an afterthought.

3    It's detailed I think with the existing authority on pages 6 and

4    7 of my Memorandum of Law.  It was not simply thrown in there.

5    And I think if counsel had looked at this more carefully in

6    anticipation of what we were going to be discussing today, she

7    clearly would have leaped out as something that she's concerned

8    about.

9          We're not asking to pick and choose where Mr. Majhor

10   would be tried, we're just simply saying he shouldn't be tried

11   in a place where there is some serious questions about whether

12   he could be given a fair and impartial jury trial and in a

13   situation where he will need to be tried by six jurors.  All of

14   those things, cumulative raised, we believe contains issues of

15   significant appeal or any review of the proceedings.

16         With regard to my affidavit from Molia Afiau, he is a

17   P.H.D.  He teaches; his resume is indicated in his affidavit.

18   He's merely only echoed and stated what is in the other

19   literature that I've cited to you in the body of my memorandum.

20         I've cited to you a book which we have by Brad Sure.

21   Mr. Sure is a professor of Elmer University Cultural

22   Anthropologist.  From what I understand and the inquire I made

23   after speaking with him, he's probably the greatest author on

24   some of the issues and concerns that have been raised in the

25   context of King litigations on other cases that we've cited.

1        Again, these people don't have authoritative opinions

2   which say that you cannot provide a fair trial by jury in

3   American Samoa.  That's not our point.

4        Our point is that in the circumstances of this case

5   where there has been so much publicity, where the publicity has

6   contained items which a jury will not hear and where there are

7   racial or ethnic aspects to the sides in this case so to speak,

8   that, that makes it very, very questionable, about whether a

9   fair and impartial trial can be assured.  And we believe that

10  there is substantial anthropological and academic and other

11  considerations which support the arguments that we're making

12  here.

13       We're not trying to be categorical; we're not trying

14  to overstate our case, however, when you talk about newspapers,

15  4,000 newspapers in a community of 60,000 people, many of whom

16  are children and other people who are going to be exempt from

17  jury services in any event, that's a substantial circulation.

18       That is a substantial impact on the creation of public

19  opinion coupled that where the fact that the only news station

20  says that they cover this in a manner that is unlike any other

21  case that has been covered in that period of time and says there

22  is a substantial risk.  I think that has been created that that

23  information of an adverse nature of a prejudicial nature has

24  been communicated to a key decision maker and people who

25

1 influence other peoples opinions in this community, and that's

2 all we're saying.

3           Given those concerns, we believe that is incumbent

4 upon the court and the government to try and exhaust whatever

5 efforts can be undertaken to ensure that Mr. Mahjor receives a

6 fair and impartial trial and that's all we're asking by this

7 motion.

8           THE COURT:  All right.

9           How long is your argument going to be on the second

10 motion?

11           MR. SEITZ: Not as long.

12           THE COURT:  Are you sure?

13           MR. SEITZE:  Yes.

14           THE COURT:  Well, it's my wife's birthday, she's

15 waiting for me; so either we're going to hear it now, or we're

16 going to hear it after lunch.

17           MR. SEITZ:  I don't think I'll be more than 10 minutes

18 by way of argument.

19           THE COURT:  All right.

20           Go ahead.

21           MR. SEITZ:  This motion, the government has responded

22 and I want to start out by making some comments on their

23 response.

24           First of all, they argued that we don't have

25

1   standings.   In so doing, they misstate the basis for this

2   motion.   This is not a 5th amendment self-incrimination motion.

3   This is based on prosecutorial misconduct.   This is based upon

4   tainted evidence.   This is based upon the fact that we believe

5   we have presented at least a prima facie case that individuals

6   conspired to provide false testimony against Mr. Mahjor, and we

7   believe that there was official encouragement for them to do

8   that by virtue, the statement which I attached as exhibits of

9   the individuals whose names were mentioned in the testimony.

10          This motion is based upon the 5th amendment due process

11   clause and 14 amendments due process clause.   It's not based

12   upon self-incrimination.   Once we raise –

13          THE COURT:   I tell you right now, I don't understand

14   the connection of that part of the government's argument, so

15   don't go off too long.

16          MR. SEITZ:   Okay.

17          Our primary concern here is that the government is

18   proposing in this case and knows, we believe, that what they're

19   going to present here is perjury testimony by individuals who've

20   gotten together and put together their stories with the help of

21   the police, because all the statements were basically put down

22   and taken by the police.

23          We know also that one of those individuals has already

24   moved to set aside his own plea and he's the key individual.   We

25   assume that's predicated upon the fact that the statements he

1    made are untrue, which is the testimony, part and parcel, of

2    what they intend to present at trial in this case.

3            Now, they also castigate me in their response for

4    referring to all these individuals as co conspirators when this

5    is not a conspiracy case.  I accept that criticism.  By co

6    conspirator, co-actors, accessories, these are people involved

7    one way or other in the event which our clients are charged.

8            The fact of the matter is whenever you have an

9    accessory or an accomplice providing testimony against somebody

10   else who was alleged to have been involved in the case and that

11   testimony has been induced in some manner by promises of

12   leniency, there is a standard instruction, which will be given

13   as a matter of law that says you've got to regard that kind of

14   testimony with some degree of care because the person has

15   ulterior mode indications, and that's all we're saying about the

16   testimony of the individuals their not co conspiracy.  They're

17   access through a missing -- and apparently if the witnesses

18   testified today and that can be believed by these individuals

19   all got together and they collaborated on their stories, and we

20   believe there is at least implication that was done on the

21   police putting pressure on them to do that once they provide

22   that testimony.  As I say, it is incumbent upon the State to at

23   least address the issue of whether or not there has been any

24   official misconduct.  This is not the credibility of these

25   witnesses.  It is a question of whether or not the police

1   activities have been involved in obtaining personal testimony

2   and whether the prosecutor is going to take that testimony and

3   run with it.

4           The other thing they say is that they distinguished or

5   attempted to distinguish one of the cases that we cited by

6   saying that, in that case, the court was dealing with people who

7   were young, who were I think under 18.  If you look at the

8   statement, who were these key witnesses in this case?  And we

9   have attached exhibits and you will see that most of these

10  individuals are 19 years old.  They are young kids and they are

11  easily influenced and they are easily apparently brought to the

12  position where they would collaborate against Mr. Mahjor as he's

13  been alleged.  And I think, therefore, we have certainly

14  reiterated an implication based upon the testimony as presented

15  that these individuals officially collaborated one way or

16  another to provide a false picture of what transpired and that

17  it is incumbent upon the government to present evidence to rebut

18  that inference as been created.  That's all that I have to offer

19  on our motion other than what was contained in the motion today.

20          THE COURT:  Ms. Sione?

21          MS. SIONE:  Just quickly, Your Honor.

22          I've listened to what he said and I'm just wondering

23  based on what we heard, where is the prosecutorial misconduct,

24  number 1; and where is the official inducement by the police?

25          I mean that sounds like part of his argument is

1  because of some police or somebody that they decided to conspire

2  together to blame his client and I.D. and also -- so that's

3  troubling to me because that's not clearly not what was

4  presented here on the witness stand.  And I also would like to

5  point out, although I understand you have to take your witnesses

6  as you find them, but what we had is one gentleman who was

7  accused of murder who was eventually acquitted of murder but who

8  admitted just now, today, and also previously under oath, that

9  he lied to the police, and also admitted that he did commit the

10  murder, but basically got away with it.

11        Our second witness was another murderer who took the

12  stand and he took the stand at his jury trial, and unfortunately

13  I wasn't at that trial.  I don't even know who this gentleman

14  is, but I would like to have an opportunity, since he took the

15  stand at his own trial, to look at the transcript and see what

16  he said under oath at that trial because, Your Honor, if he lied

17  under oath in that proceeding, I think it would cast some pretty

18  serious doubt in his credibility in this one.

19        The 3rd person, who I might add had the least serious

20  charges against him, didn't know who he heard the conversation

21  from, didn't know when, didn't remember who else he told about

22  it, so basically he contributed nothing.

23        The 4th person, the gentleman who was in there for

24  Burglary, only mentions the gentleman by the name "Talofa;"

25  didn't mention any other people who brought it up.  He had no

1  date and no details.  For all of these reasons, Your Honor,

2  again we'd just ask that the defendant's motion be denied.

3  There's no evidence of anything.  We would ask that it be

4  denied.

5           Thank you.

6           THE COURT:  All right.

7           MR. SEITZ:  Just briefly.

8           What you have in this case is several witnesses giving

9  official statements and I introduced -- I offered statements as

10 exhibits to my motion.  The statements say they took, or were

11 taken, by the police.  If we call the police officers, I'm sure

12 they're going to deny that they put any on these individuals.

13 If we call the individuals, all who are still charged with

14 something, they themselves are undoubtedly going to take the 5th

15 amendment and are not going to testify on the advice of their

16 lawyers.  We don't have direct waiver showing why these

17 individuals, all of them, collaborated to provide false

18 testimony.

19          We have four witnesses, all of whom from different

20 advantage points, all of whom admittedly were in custody and

21 have credibility issues.  Based upon that, by virtue of their

22 records, all of them testified that they overheard these

23 individuals together plotting in one form or another to present

24 perjury testimony.  That, in and of itself, raises a specter of

25 the use of perjury testimony.

1    Now, if the government is telling us that their

2 going to investigate before they call any of these witnesses at

3 a trial and going to determine beforehand, as they are ethically

4 required to do, that their testimony is not perjured, then we

5 probably would be satisfied with that, but I don't hear the

6 government making that representation.

7    I don't hear the government, after having made this

8 motion again more than two and a half months ago, I don't hear

9 the government telling us that they can entirely remove the

10 specter that the police can engineer this entirely because then

11 it was the police who took the statement.

12    The couple don't read and write English and yet they

13 gave statements in English.  And there are therefore serious

14 questions about the intensity of the process with which these

15 statements and testimony which reflect in those statements came

16 to exist and that's all we're raising.

17    THE COURT:  All right.

18    It will be under advisement.

19

20    (Conclusion)

21

22

23

24

25

- 66

IN THE HIGH COURT OF AMERICAN SAMOA

TRIAL DIVISION

AMERICAN SAMOA GOVERNMENT,    )    HCCR No. 10-03
                              )
        Plaintiff,            )
                              )    CERTIFICATE OF REPORTER
vs.                           )
                              )
RICHARD MAHJOR,               )
                              )
        Defendant.            )
                              )
_____ )

        I, ELIZABETH V. PUNI, Official Court Reporter for the

High Court of American Samoa, do hereby certify that pages 1

thru 66 comprise a true and correct transcript of my shorthand

notes so taken in these proceedings transcribed to the best of

my skills and ability.

        I further certify that I am not interested in the

event of this action.

        Dated: 2/18/05

                              _____
                              ELIZABETH V. PUNI
                              Court Reporter

County of Maoputasi        )
                           )
Territory of American Samoa )


_____
NOTARY PUBLIC

My Commission expires: 12/31/05

- 67